In the District Court of the United States
For the District of South Carolina
CHARLESTON DIVISION

| | | |
|---|---|---|
| BRANDY NICOLE STOKES, | ) | C.A. NO. 2:05-2970-DCN-GCK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| CHARLESTON COUNTY SCHOOL | ) | **OF THE MAGISTRATE JUDGE** |
| DISTRICT and WANDA MARSHALL, | ) | |
| in her individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## I. INTRODUCTION

The Plaintiff, Brandy Nicole Stokes ("Plaintiff" or "Stokes"), a white female, filed this action against her former employer, the Charleston County School District (the "Charleston County") and Wanda Marshall ("Marshall"), a black female who was the principal of the Charleston County middle school where Plaintiff was employed. Plaintiff alleges that the Defendants discriminated against her and interfered with Plaintiff's right to contract, in violation of 42 U.S.C. § 1981, as amended; that they discriminated against Plaintiff on the basis of her race, in violation of the equal protection clause and 42 U.S.C. § 1983; and that they breached an employment contract with Plaintiff.[1]

---

[1] Plaintiff also had alleged a Third Cause of Action under Title VI, 42 U.S.C. 2000d, but conceded that cause of action in her Response to Defendants' Motion for Summary Judgment. *See* [39-1] at pp. 24-25.

Plaintiff seeks compensatory damages, loss of wages and benefits; punitive damages, if applicable, in an amount to be proven at trial; attorneys' fees and cost, prejudgment interest on all claims; injunctive relief and costs of this action. [1-1]

This matter is before the court pursuant to provisions of Title 28, United States Code Section 636(b)(1)(B), and Local Civil Rule 73.02(B)(2)(g), D.S.C., which authorizes Magistrate Judges to review all pretrial matters in employment discrimination cases filed under Title 42 U.S.C. §§ 1983 and 2000e and submit findings and recommendations to the District Court.

## II.  FACTS

As Plaintiff is the non-moving party in this case, the facts as taken from Plaintiff's affidavit and her deposition are accepted as true for purposes of this motion.

Plaintiff attended Bishop England High School, in Charleston, South Carolina, but left school before graduating to pursue a job.[2]  In 1996, she moved to Portland, Maine, earned a GED, and enrolled in college at the University of Maine.[3]  She attended the University of Maine from 1997 until about 2002.  Plaintiff was graduated with a BS, with a major in Elementary Education and a minor in English.[4]  Due to Plaintiff's health problems, she was unable to complete the student teaching portion of her final year of elementary education work.  Instead, she was allowed to complete the degree by meeting the performance requirements in an alternative class, which did not include the physical demands of student teaching.[5]  Thus, while

---

[2]  Stokes Aff. 1-2.

[3]  Stokes Aff. 3.

[4]  Stokes Aff. 4.

[5]  Stokes Aff. 5, 7.

Plaintiff completed her degree work, and earned a degree in early childhood education, she did not hold a teaching certificate.

Because Plaintiff did not complete her student teaching requirements while in college, she was not eligible for a professional teaching certificate. Accordingly, Plaintiff applied for and received from the South Carolina State Department of Education a conditional (Critical Needs) teaching certificate which was valid for one year, from July 1, 2002 to June 30, 2003. Plaintiff came to the District on a conditional (Critical Needs) teaching certificate awarded by the SDE under S.C. Code Section 59-26-30(A)(8), which provides for the award of such a certificate

> to a person eligible to hold a teaching certificate who does not qualify for full certification under item (7) above provided the person has earned a bachelor's degree from an accredited college or university with a major in a certification area for which the board has determined there exists a critical shortage of teachers, and the person has passed the appropriate teaching examination. The board may renew a conditional teaching certificate annually for a maximum of three years, if the holder of the certificate shows satisfactory progress toward completion of a teacher certification program prescribed by the board. In part, satisfactory progress is the progress that the holder of a conditional certificate should complete the requirements for full certification within three years of being conditionally certified.[6]

Teachers hired under this section of the law are known as PACE teachers. The SDE has adopted a program that PACE program teachers must complete within a three(3) year period in order to receive professional certification. Until a PACE teacher receives professional certification, he or she is not entitled to the protections of the Teacher Employment and Dismissal Act, and a school district may elect not to rehire the teacher for any reason or no reason.[7]

As Plaintiff explains, the PACE program permits a person who has skills in a certain area (in Plaintiff's case, a minor in English) in which there is a critical need for teachers, to be

---

[6] Varnado Aff., attached as Exhibit 6 to Defendants' Motion for Summary Judgment [36-1] at ¶ 3.

[7] Varnado Aff. at ¶ 3.

accepted as a teacher and given provisional status. The new teacher proceeds through the first year and is basically taught how to teach "on the job" through an involved evaluation and training process. The first year teacher in this program is known as an "induction" teacher. At the end of the year, or the end of the program, the new teacher should, if successful, emerge with a teaching certificate.[8]

As Plaintiff approached graduation in Maine in 2002, she began to look for a teaching job in the Charleston area. She contacted the Recruitment center for the District and learned that Brentwood Middle School ("Brentwood") had open positions.[9] As a member of the PACE program, in August 2002 Plaintiff applied for a teaching position at Brentwood, and later went to Brentwood to interview. Plaintiff met with the Assistant Principal, Mr. Reginald Bright, a white male ("Bright").[10] Bright told Plaintiff that Brentwood was well known within the district as having students from the lower socio-economic sector, and that the students at the school were considered "rough" throughout the district. Bright asked Plaintiff whether she felt she was equipped to handle "discipline issues" in the classroom; Plaintiff stated she had received full training in early childhood education, but was only in the critical needs because she lacked a teaching certificate, and stated that she felt that she was prepared to meet the challenges of classroom management.[11] After the interview with Bright, Plaintiff met with Marshall, the principal of Brentwood. Plaintiff discussed her training and background from the University of

---

[8]    Stokes Aff. 10.

[9]    Stokes Aff. 11.

[10]   Stokes Aff. 13.

[11]   Stokes Aff. 14-15.

Maine; Marshall told Stokes that she believed that the University of Maine did not offer a diverse experience because Marshall thought the student population was mostly white and that the student population at Brentwood was mostly black.[12] This was the first time that Plaintiff had heard that Brentwood had a predominantly black student population.[13] Plaintiff told Marshall about her background and her desire to help at-risk children decide to remain in school. In response, Marshall told her that she had three strikes against her as a teacher at Brentwood: First, Plaintiff was female, second, she was small, and third, she was white. Plaintiff was upset to hear Marshall say this, and told her that she did not think that things like that should be disadvantageous in a teaching position.[14]

Stokes was not offered the teaching position that day, but Marshall called her later and told Stokes that she was going to "take a chance" on her and hire her to work at Brentwood as an English teacher under the critical needs program.[15] Plaintiff would teach four periods of Eighth grade students.[16]

Plaintiff reported for orientation at Brentwood prior to the first day of classes. She was issued a handbook with written policies and procedures which included a provision which prohibited harassment based on race, and purported to be a "Zero Tolerance" policy as to racial and other types of harassment in the school.[17]

---

[12]     Stokes Aff. 17-18.

[13]     Stokes Aff. 19.

[14]     Stokes Aff. 20-21.

[15]     Stokes Aff. 22.

[16]     Stokes Aff. 23.

[17]     Stokes Aff. 25-27.

Plaintiff began teaching her classes, which were comprised of almost all African American Students. She recalled only two white students among the African American students.[18] At times, Marshall would come into the classroom and observe Plaintiff and take notes. Plaintiff did not receive any negative feedback from Marshall; the only feedback Plaintiff recalls is praise for having appropriately handled a discipline issue with a male student.[19]

Plaintiff was assigned to a four teacher team, consisting of three white teachers, including Plaintiff, and one black teacher.[20] The team met regularly; if there were a discipline issue in the class (excepting ones that had to be dealt with immediately by their nature), the issue would be presented to the group, which would recommend a disciplinary action to the administration, or engage the student in a detention or parent-teacher meeting. The parent-teacher meetings and detention were the only forms of discipline which the teachers would impose directly. Teachers also were allowed to go straight to the administration.[21] Marshall said that she and the administrative staff were responsible for discipline in the school. The staff involved in disciplinary matters included Principal Marshall, Assistant Principal Bright, Student Concern Specialist Green, and Resource Officer Love.

Brentwood's classrooms had "panic buttons" which allowed a teacher to call for help in the event of a severe discipline situation.[22] Within the first week of classes, Plaintiff began to be subjected to racial slurs and insubordinate behavior from African American students. Students

---

[18]  Stokes Aff. 30-31.

[19]  Stokes Aff. 32-33.

[20]  Deposition of Stokes, Vol. I, ¶ 66-78; 81-82; 83-85.

[21]  Stokes Aff. 34-35.

[22]  Stokes Aff. 44.

referred to her as: cracker, honkey, white bitch, white mother-fucking bitch, white cunt, and whore. Plaintiff's students told her: "My momma said I don't have to listen to your cracker ass," and some students would combine racist slurs with sexual overtures such as: "I've always wanted to sleep with a white woman;" or "Once you go black, you'll never go back" or "Let me show you what a black man can do."[23] Plaintiff was shocked at the pervasiveness of the racial slurs and sexually aggressive comments from the students and reported the incidents to her teacher group. Teacher-parent conferences were held, and some students received detentions, but Plaintiff did not see any real effect.[24] The Plaintiff was exposed to student violence almost every day, and it seemed to Plaintiff that the police were constantly being summoned to Brentwood in response to student violence.[25]

Plaintiff testified that she made numerous referrals of student discipline problems and that she hit the panic button in her room 6-7 times every day, for a total of between 50 and 60 times during the approximately forty days that she taught at Brentwood.)[26] She testified that the administration was slow to respond to her when she did hit the panic button.[27]

On one occasion Plaintiff confiscated a drawing by a group of African American males who had constantly harassing the one white male student in class. The drawing showed a white child hanging by the neck from a tree limb, surrounded by African American children who were brandishing knives and weapons. The drawing was captioned: "Die Whitey Die!" Plaintiff

---

[23] Stokes Aff. 36-37.

[24] Stokes Aff. 39.

[25] Stokes Aff. 45.

[26] Deposition of Stokes, Vol. I, ¶ 103-06; 110-14.

[27] Stokes Aff. 47- 50.

showed the drawing to Marshall, who took no action against the African American students but who eventually disciplined the white student who had been found defending himself from several of the African American males.  At a parent teacher conference, the white student's father told Plaintiff that Marshall had called him a racist when he had tried to lodge a complaint about the way the matter was handled.[28]

On one occasion, about a week into the school year, an African American male student was being disruptive towards the class.  Plaintiff approached him, and the student responded by calling Plaintiff a "white cunt" and a whore in front of the class.  Plaintiff met with Marshall, who told Plaintiff that this was typical African American behavior and that Plaintiff would have to accept the conduct as part of the children's culture.[29]

After an African American male student entered a classroom where Plaintiff was standing alone, and approached her in a threatening manner while singing a rap song about "raping a white bitch," Plaintiff again approached Marshall and, in tears, reported the incident. Plaintiff recalls that Marshall rolled her eyes, and said "here we go again, another white teacher trying to bring these kids down."  Marshall did not take any action in response to Plaintiff's complaint.[30]

Plaintiff began work in mid-August, was absent for fourteen (14) days prior to an alleged incident that occurred on November 14, 2002,[31] when Plaintiff was physically attacked in the

---

[28] Deposition of Stokes, Vol. II, p. 34.

[29] Deposition of Stokes, Vol. I, ¶ 115-120 and Stokes Aff. 57

[30] Deposition of Stokes, Vol. II, ¶ 43-45; 51-53 and Stokes Aff. 52.

[31] Deposition of Stokes, Vol. I, ¶ 90-98.  Plaintiff had become pregnant in September or October, suffered complications, and lost her baby. Shortly thereafter, she was taken out of work by her physician for emergency surgery related to the failed pregnancy.  She was out

classroom after she attempted to stop a black male student from harassing a female student. Plaintiff pressed the panic button, and attempted to escort the girl out of the classroom. The male student "knocked" Plaintiff in the mouth and pushed her up against a desk. Plaintiff's tooth was chipped as a result of the altercation.[32] Plaintiff returned to the school the following day but the school nurse sent her to the doctor, over protests from Ms. Marshall. (Stokes Aff. 66) Stokes returned to work until November 19, 2002[33] during which she learned that the student who had injured her had been given only a two day suspension and had returned to campus. Plaintiff was upset about this incident[34] and began to contact each member of the Charleston County School District board by telephone or e-mail. In each communication, Plaintiff reported on the general state of the school, including the violence and racist slurs from the students, the apathy of the administration, and her personal situation.[35] Plaintiff received only one response to her complaints--Ms. Cook, a board member, offered to give Ms. Stokes and her family a Thanksgiving dinner.[36]

Plaintiff was taken out of work by her doctor on November 19, 2002, which was her last day of work.[37] Plaintiff filed a workers compensation claim against the Defendant District.

---

of work for several weeks. (Stokes Aff. 40)

[32]  Deposition of Stokes, Vol. I, ¶ 134-37 and Stokes Aff. 58-62.

[33]  Deposition of Stokes, Vol. II, p. 14.

[34]  Stokes Aff. 67-69.

[35]  Stokes Aff. 69.

[36]  Stokes Aff. 70.

[37]  Deposition of Stokes, Vol. II, p. 34 and Stokes Aff. 74-75.

Plaintiff settled her worker's compensation claim with Defendant District in December 2003 for a payment by the District of $20,000.00.[38]

Beginning in August of 2002, Plaintiff began taking pain medication and at some point she became addicted to Percocet. Plaintiff testified that the pain medication did not have any impact on her ability to work.[39]

Plaintiff was out of work from November 19, 2002 until February 2003, at which time she was cleared to return to work.[40] However, at the same time Plaintiff was planning to return to work, she was seeing numerous doctors seeking pain medication and attention to her alleged ailments.[41] Plaintiff called Marshall to inform her of her return date. In response, Marshall told Plaintiff that she had terminated Plaintiff's contract, and that Plaintiff should not return to work.[42] Marshall also said she would "snowball" the Plaintiff's teaching career.[43]

No one was hired as a replacement for Plaintiff during the 2002-2003 school year. The teachers on Plaintiff's team divided up the students and taught the classes without the assistance of a fourth teacher.[44]

At the time, Plaintiff believed that the "snowball" comment meant that Marshall intended to say negative things about the Plaintiff. Plaintiff she later found out that, because of a change

---

[38] Deposition of Stokes, Vol. I, ¶ 55-56; Vol. II, p. 19.

[39] Deposition of Stokes, Vol. I., ¶ 98-102; Vol. II, p. 9.

[40] Stokes Dep Vol. II, p. 18 and Stokes Aff. 79.

[41] Deposition of Stokes, Vol. II, ¶ 13-14.

[42] Deposition of Stokes, Vol. II, ¶ 17-20; 130-31 and Stokes Aff. 78-81.

[43] Deposition of Stokes, Vol. II, ¶ 17-20; 130-31.

[44] Deposition of Stephanie Thigpen, ¶ 14-15.

in the rules of the critical needs program, Plaintiff would not be allowed to re-enroll as a critical needs teacher. Although Plaintiff had entered with a minor in English, which was a critical needs area, the new rules required a teacher in the critical needs program to have a major in the critical need area she planned to fill. To date, there is not another program through which the Plaintiff could achieve a Teaching Certificate on the job. (Stokes Aff. 81-83)

At the end of the 2002-03 school year, after Plaintiff had been absent from her job since November 19, 2002, the Defendant District terminated Plaintiff as an employee. At that time, Plaintiff was not eligible for a teaching certificate because she had not done what she needed to do in order to renew her conditional teaching certificate. Accordingly, the District could not issue Plaintiff a teaching contract for the 2003-04 school year because Plaintiff was not qualified to be a teacher.[45] Under the PACE guidelines, Plaintiff was not eligible to renew her teaching certificate because she had not complied with the requirements of the PACE program.[46]

The principal of a school has no authority to dismiss teachers in the State of South Carolina, so Defendant Marshall could not and did not terminate Plaintiff. As stated in Plaintiff's personnel file, she was terminated at the end of the school year because she was not issued a contract for the next year.[47]

---

[45] Varnado Affidavit at ¶ 4, attached as Exhibit 6 to Defendants' Motion. [36-1]

[46] Varna do Affidavit.

[47] A copy of Plaintiff's termination notice from her personnel file is attached as Exhibit A to the Varnado Affidavit.

### III.  PROCEDURAL BACKGROUND TO THIS ACTION

Plaintiff first spoke out to the media about her allegations against the Defendants in April 2004.[48]  On October 18, 2005, the Plaintiff filed this action against the District and Marshall.[49]  Thereafter, discovery was commenced, and on July 7, 2006 the Defendants filed a Motion for Summary Judgment pursuant to Rule 56, Fed.R.Civ.P., with a supporting Memorandum.  [36-1; 36-2]  On July 26, 2006, the Plaintiff timely filed her opposition to Defendants' Motion.  [39-1]  The Defendants filed their reply on July 31, 2006.  [40-1]  Therefore, this matter is ripe for review by the undersigned.

### IV.  SUMMARY JUDGMENT STANDARD

Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues.  *Ballinger v. North Carolina Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir.), *cert. denied*, 484 U.S. 897 (1987).  This does not mean that summary judgment is never appropriate in these cases.  To the contrary, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Id., quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice."  *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985).

---

[48]  Deposition of Stokes, Vol. II, ¶ 24-25.

[49]  Petitioner brought this action as a *pro se* litigant and later retained counsel.

The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991). The Defendants, as the moving parties, bear the initial burden of pointing to the absence of a genuine issue of material fact. *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the Defendants carry this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." *Id*. at 718-19, *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "[O]nce the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Id. and Doyle v. Sentry Inc.*, 877 F.Supp. 1002, 1005 (E.D.Va. 1995). Instead, the non-moving party is required to submit evidence of specific facts by way of affidavits (*see* Fed.R.Civ.P. 56(e)), depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. *Baber, citing Celotex Corp., supra*. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) *and DeLeon v. St. Joseph Hospital, Inc.*, 871 F.2d 1229, 1233 n. 7 (4th Cir. 1989). Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. *Evans v. Technologies Applications & Servs. Co.*, 80 F.3d 954 (4th Cir. 1996).

## V. ANALYSIS

### A. Plaintiff's First Cause of Action: Violation of 42 U.S.C. § 1981

Read liberally, Plaintiff's complaint alleges that the Defendants District and Marshall Defendants discriminated against her and interfered with Plaintiff's right to contract, on the basis of Plaintiff's race, in violation of 42 U.S.C. § 1981. Section 1981(a) grants all persons within the jurisdiction of the United States "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Section 1981(b) provides:

> (b) "Make and enforce contracts" defined
>
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

In order to prevail under a Section 1981 claim, a plaintiff must prove: (1) he or she is a member of a racial minority; (2) the defendants' termination of her employment was because of her race; and (3) that their discrimination was intentional, and concerned one or more of the activities enumerated in the statute; in this case, the making and enforcing of a contract. *See Jordan v. Alternative Resources Corp.,* — F.3d —, 2006 WL 2337333 at *10 (4th Cir. August 14, 2006), *citing Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir. 1993). However, Plaintiff cannot prove the first prong of this test: as a caucasian, she is not a member of a racial minority. Thus, it is recommended that her Section 1981 be dismissed as against both Defendants.

### B. Plaintiff's Second Cause of Action: Violation of 42 U.S.C. § 1983

Plaintiff's claim under Section 1983 appears to allege that the Defendants' discrimination on the basis of her race was in violation of her right to equal protection under the Fourteenth

Amendment.[50]  The touchstone of governmental liability under Section 1983 is the existence of a policy or custom which results in the alleged constitutional violation.  In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that municipalities and other local governmental bodies constitute "persons" within the meaning of Section 1983.  *Monell*, 436 U.S. at 688-89.  Significantly, however, *Monell* held that a municipality could not be held liable under Section 1983 under a theory of respondeat superior unless it could be shown that a state actor "under color of some official policy, 'causes' an employee to violate another's constitutional rights[.]"  *Monell,* 436 U.S. at 692.  Put another way, a municipality will be subject to Section 1983 liability only when "it causes [the] deprivation through an official policy or custom."  *Carter v. Morris,* 164 F.3d 215, 218 (4th Cir. 1999).

In the present case, Plaintiff has failed to set forth a viable Section 1983 claim against the District or against Marshall because she has failed to <u>allege</u>, much less prove, that any alleged discriminatory decisions regarding her termination were pursuant to official District-wide policy or custom.  Plaintiff has not set forth any allegation that relates to any school except Brentwood.  In other words, Plaintiff has failed to suggest that anything that occurred at Brentwood was a reflection of the policy or custom of the District.

Plaintiff also has filed suit against Marshall in her individual capacity.  In order for an individual to be liable for a due process deprivation, it must be "affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights.  The doctrine of *respondeat superior* has no application" under the civil rights laws.  *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (*quotation and citations omitted*).  Indeed, Plaintiff squarely asserts that

---

[50]     *See* Complaint [1-1] at ¶ 36.

the Defendant District's Section 1983 liability is predicated solely on the behavior of its individual employees as its agents, as set forth in the Complaint:

> As the principal at Brentwood Middle School, Marshall was the District's highest ranking official at the school and was the District's final policymaker at the school regarding employment of teachers, so that the actions of Marshall are those of the District for purposes of liability under 42 U.S.C. § 1983.[51]

Plaintiff's complete failure to suggest that Marshall's individual decision constituted the official policy of the District is fatal to her Section 1983 claim. Regardless of whether Marshall was the principal of Brentwood, Plaintiff has offered no evidence that Marshall was responsible for any policy-making that adversely affected Plaintiff. Moreover, Plaintiff's claims are not supported by the law. The Fourth Circuit has recognized that the board of trustees for a county school system is the final policy maker regarding employment matters, not school personnel. *See Hall v. Marion School Dist. No. 2*, 31 F.3d 183 (4th Cir. 1994) ("Under South Carolina law, the Board is the final policymaker with regard to the employment and discharge of teachers."); *see also Riddick v. School Bd. of City of Portsmouth*, 238 F.3d 518 (4th Cir. 2000) (affirming summary judgment for school board because the board itself, and not the superintendent, was the final policymaking body for purposes of civil rights liability.).

Plaintiff's argument that Marshall, as "a policy maker,"[52] supported the policy of harassment by students also must fail because there is no evidence that the Board of Trustees knew of the allegedly harassment which began in August 2003. Although Plaintiff claims that Marshall permitted the harassment to go unchecked for months, in apparent contradiction, however, Plaintiff has admitted that she did not notify the Board of Trustees until the end of

---

[51] Complaint [1-1] at ¶ 37.

[52] *See* Plaintiff's Memorandum [10-2] at p. 3.

November 2003 of Marshall's tolerance to the alleged racial harassment about which Plaintiff complained.  Under this time-line, it is impossible to conclude that Defendant Marshall's conduct could have been the product of any official policy, because Defendant Marshall's alleged actions occurred <u>before</u> the Board of Trustees learned of the behavior.  It cannot be expected that the Board of Trustees would be able to endorse a course of conduct about which it knew nothing.  Indeed, it was only when Plaintiff complained about the offending conduct that the Board first learned about it.  Thus, Plaintiff's argument is without merit, as it is based upon an "unspoken policy" allegedly practiced by Defendant Marshall, that was not even known to the Board of Trustees until months after Defendant Marshall's alleged practice of tolerating the harassment.

In conclusion, Plaintiff has never alleged any District-wide policy that adversely affected her employment.  Instead, Plaintiff relies exclusively on the allegations against Marshall, the principal at Brentwood, in an attempt to impose liability against the District.  Because Plaintiff has proffered no evidence that the official policy of the District is to discriminate on account of race, it is recommended that summary judgment should be granted to the Defendant District as to the Second Cause of Action under Section 1983.  Furthermore, because Marshall is not a policymaker with respect to employment matters for purposes of civil rights liability, *see Hall and Riddick*, Plaintiff cannot state a viable cause of action against Marshall under Section 1983.

### C.  Plaintiff's Fourth Cause of Action:  Breach of Contract

Plaintiff's Fourth Cause of Action alleges that her contract was breached because (1) she had a handbook that promised that she would not have to work in a racially hostile work environment and that those who were racially hostile would be disciplined and (2) Defendant

Marshall, as the agent of the Defendant District, terminated Plaintiff's employment in February of 2003. She then alleged her damages from these alleged breaches to be as follows:

> As a direct and proximate result of Defendant District's breach of its contract with Plaintiff, Plaintiff has been damaged in that she has lost her employment with the District, including salary and benefits, as well as her ability to obtain future employment as a teach [sic]. Plaintiff further has been damaged in hat [sic] she has endured the humiliation of her contract not being renewed and the stress and mental anguish of the abuse and harassment itself, of being without adequate means to support herself, and of being prevented from pursuing her chosen career as a teacher.

All of these allegations of damages relate to Plaintiff's alleged dismissal as a teacher. The undisputed facts are that Plaintiff obtained a conditional one year teaching certificate, was hired and given a one year teaching contract, began teaching, was absent for approximately one-third of the first sixty (60) days of school after which she left on workers' compensation leave and never returned, and her contract and teaching certificate expired in May of 2003 so she was no longer eligible to be a teacher with any school district in South Carolina.

In order to set forth a cause of action for breach of contract, the complaining party must show both a breach of the contract, and damages. As pled, however, Plaintiff has only included a claim for damages as relating to the emotional distress that the alleged breach caused her. However, damages for emotional distress cannot be recovered in such a claim, and, in fact, Plaintiff agrees by conceding: "Defendant is correct in stating that emotional damages are not compensable for a breach of contract action."[53] However, Plaintiff asserts that this Court should adopt a new principle of law for South Carolina which permits such recovery if the contractual term were specifically designed to prevent emotional damages in the first place.[54] The Court declines Plaintiff's invitation to craft new state law. First, the Court has not found any law that

---

[53]     Plaintiff's Response [39-1] at p. 25.

[54]     *Id.*

would support Plaintiff's novel theory, and, indeed, Plaintiff has failed to supply any. Second, there is absolutely no evidence to suggest that the anti-discrimination clause of Plaintiff's contract upon which she has based this cause of action was meant to prevent employees from becoming emotional distressed or upset in their workplace. The only damages to which Plaintiff would be entitled for a breach of a contract is the cost to place the non-breaching party in the same condition he or she would have enjoyed had it not been for the breach. *See*, *e.g., Vaught v. A.O. Hardee & Sons, Inc.*, 366 S.C. 475, 623 S.E.2d 373, 375-376 (S.C. 2005).

In the present case, even if the court were to find that there occurred a breach of the employment contract (which it most certainly does not), Plaintiff would be entitled to recover whatever wages she was unable to earn. While Defendants do not dispute that measure of damages, Plaintiff cannot show that, but for her alleged discrimination, she would have received any further wages from employment with the District. Therefore, it is recommended that Plaintiff's claim for breach of her employment contract be dismissed.

## CONCLUSION

For the foregoing reasons, it is recommended that **Defendants' Motion for Summary Judgment [36-1] should be granted.**

S/George C. Kosko
United States Magistrate Judge

August 21, 2006
Charleston, South Carolina